| UNITED STATES DISTRICT COURT | USDC SDNY |
| SOUTHERN DISTRICT OF NEW YORK | DOCUMENT |
| | ELECTRONICALLY FILED |
| | DOC #: _____ |
| | DATE FILED: January 10, 2018 |

------------------------------------------------------------ X
:
JAVION CAMACHO,                                              :
:
                      Petitioner,          :
:
         -v-                                        :          13-cr-0058 (KBF)
:          17-cv-1440 (KBF)
UNITED STATES OF AMERICA,                                    :
:          OPINION & ORDER
                      Respondent.         :
:
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      Javion Camacho, currently incarcerated at F.C.I. Bennettsville, brings a petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Camacho was sentenced on February 21, 2014 to 250 months of incarceration for conspiracy to possess with intent to distribute heroin under 21 U.S.C. § 846. Camacho, acting pro se,[1] puts forth four bases for his petition: lack of jurisdiction; breach of the plea agreement; vagueness under <u>Johnson</u>; and ineffective assistance of counsel. For the reasons set forth below, the petition is DENIED.

---

[1] The Court applies a "liberal construction of [pro se] pleadings, which should be read 'to raise the strongest arguments that they suggest.'" <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001) (quoting <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996)). Nevertheless, a Court may dismiss a petition under § 2255 without directing the United States attorney to file a response or holding an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." <u>Gonzalez v. United States</u>, 722 F.3d 118, 130 (2d Cir. 2013) (quoting 28 U.S.C. § 2255); Fed. R. Governing Sec. 2255 Proceedings for the U.S.D.C. 4(b) ("If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party."). Here, the petition raises no factual dispute and can thus be resolved without a Government response and/or hearing.

I.   BACKGROUND

On December 14, 2012, a cooperating witness ("CW") told Jancey Valle, a member of a "crew of individuals who rob narcotics traffickers," that a confidential informant ("CI-1") "had information" about the locations of narcotics stashes. (Presentence Investigation Report ("PSR") ¶ 28). This was done at the direction of a case agent and under surveillance. (Id.)  Valle responded that Camacho would be interested in meeting with CI-1, and that Camacho's crew "impersonates police officers, and may include actual police officers." (Id.)  Three days later, on December 17, 2012, the CW and CI-1 (at the direction of the Drug Enforcement Agency ("DEA")) met with Valle and Camacho. (Id. ¶ 30.) CI-1 told Camacho that a minimum of ten kilograms of heroin (the "Shipment") would be arriving in New York City and that CI-1 wanted to rob the Shipment. (Id.) Camacho informed CI-1 that he had a "robbery crew of police impersonators who would be able to carry out the robbery" and that he expected to be able to sell the heroin. (Id.) Camacho gave CI-1 a telephone number and told CI-1 to keep him informed about the Shipment. (Id.)

On December 31, 2012, a case agent reviewed text messages exchanged by Camacho and CI-1 that day in which they agreed to meet on January 2, 2013. (Id. ¶ 31.) On January 2, Camacho met CI-1 at a restaurant along with Valle and Julio Camacho, his brother. (Id. ¶ 32.) CI-1 told Camacho that the Shipment would contain between twenty and forty kilograms of heroin; Camacho responded that the crew could "take over Jersey City" with that amount. (Id.) Julio Camacho asked

2

CI-1 whether he would mind if the traffickers expecting the Shipment were "laid out"—killed—during the robbery. (Id.)

On January 8, 2014, Camacho and CI-1 exchanged text messages and planned to meet the next day for the robbery. (Id. ¶ 33.) On January 9, Camacho texted CI-1 in preparation about the time and place, and at approximately 8:15 p.m., CI-1 met Camacho at a restaurant. (Id. ¶¶ 34–35.) CI-1 told Camacho and Victor Moral, one of the drivers, that the Shipment contained approximately twenty kilograms of heroin; Camacho told CI-1 "there was a police officer on the robbery crew in case they needed to shoot someone." (Id. ¶¶ 35–36.) Eventually, a number of the co-defendants had arrived at the restaurant. Six cars then left, driving single file toward the destination. Camacho was the front passenger in the lead car. When they reached Lakeview Place, CI-1 called Camacho to tell him that the "spot" was up on the right and that Camacho's car should pull over just before it. (Id. ¶¶ 36–37.) When all six cars had turned right and pulled over, law enforcement approached and placed every individual under arrest. (Id. ¶ 37.)

Federal agents searched the cars; in the lead car (Camacho's) they uncovered, inter alia, a ski mask, a GPS unit (purportedly to track vehicles used by narcotics traffickers), a firearm holster, and gloves. (Id. ¶ 39.) The car was also equipped with a "mechanized device that, at the direction of the driver, would cover the license plate with a steel plate." (Id. ¶ 40.) After being advised of his Miranda rights, Camacho told agents that he had "just finished a sentence for manslaughter and the police had caught him 'red-handed.'" (Id. ¶ 46.)

3

The Government maintained that Camacho was the "most culpable" of the defendants, as he participated in all planning and managed logistics, strategy, and distribution of the expected drug proceeds. (Id. ¶ 52.) He also served as the primary point of contact with the crew and drove in the lead car. (Id.)

On September 18, 2013, Camacho pled guilty to one count of conspiracy to violate federal narcotics laws pursuant to an agreement with a "non-binding stipulated sentencing range of 151–88 months." (Plea Tr. at 36:1–3; ECF No. 1, Mot. at 6.) Louis Borrero, one of Camacho's co-defendants, went to trial; during that proceeding, this Court learned new facts about Camacho. (Dec. 17, 2013 Hearing Tr. at 6:14–7:6.) For example, the Court learned that Camacho and his crew performed various robberies of multiple kilograms of narcotics, and that "they would use as part of their modus operandi the impersonation of law enforcement either through the utilization of a vehicle and/or the utilization of . . . tools of the trade[, such as] T-shirts that said 'police' or lights that would flash, Crown Victoria cars, things of that nature." (Id. at 5:7–12.) Additionally, the crew was often armed during the robberies. (Id. at 5:13–14.) As a result, the Court informed the parties it was considering an upward variance. (Id. at 6:14–7:6.) Defendants were offered but did not seek a Fatico hearing. (Id.; 13-cr-0058, ECF No. 331, Jan. 31, 2014 Letter.) On February 21, 2014, Camacho was sentenced to 250 months of incarceration. (Sen. Tr. at 41:12–14.) Throughout the proceedings, he was represented by Mr. Jeffrey Pittell, who was appointed from the Criminal Justice Act Panel. (See Plea Tr.; Sen. Tr.)

4

## II. THE STING OPERATION & THE ABSENCE OF DRUGS IN FACT

### A. Legal Principles

#### 1. Manufactured Jurisdiction

Federal agents are not permitted to "manufacture jurisdiction" in order to prosecute criminal activity "primarily of local concern." United States v. Archer, 486 F.2d 670, 682 (2d Cir. 1973). In other words, federal officers may not "themselves suppl[y] the interstate element and act[] to ensure that an interstate element would be present." Id. (holding that federal jurisdiction may not exist when federal agents provoked interstate calls that would not otherwise have been made).

A sting operation, however, is rarely the "manufacturing" of jurisdiction. Rather, "government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits." United States v. Bout, 731 F.3d 233, 238 (2d Cir. 2013) (quoting United State v. Cromitie, 727 F.3d 194, 219 (2d. Cir. 2013)); see also United States v. Myers, 692 F.2d 823 (2d Cir. 1982) (allowing a sting operation where the Government "produced people with fictitious identities ready to pay bribes to Congressmen [but] the essential conduct of the agents and their paid informant was to see who showed up to take the bribes and videotape them in the act of doing so"). A sting operation does not become the manufacture of jurisdiction simply because an object of the crime, such as narcotics, does not exist in fact; the conspiracy was certainly real.

2. 21 U.S.C. §§ 841 and 846

Federal law makes it a crime to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Additionally, it is a crime to "attempt[] or conspire[] to commit any offense defined in this subchapter." 21 U.S.C. § 846. A defendant convicted under § 846 "shall be subject to the same penalties as those prescribed for the offense . . . ." Id.

3. Impossibility Defense

A common feature of sting operations is that the object of a conspiracy—such as drugs or other contraband—never exists in fact. However, "inability [to commit a crime] due to frustrated efforts, factual impossibilities or unforeseen circumstances does not defeat the inference of an agreement to produce contested amounts of narcotics." United States v. Hendrickson, 26 F.3d 321, 337 (2d Cir. 1994). "[T]he failure to produce is relevant only to the extent it suggests an absence of intent or agreement." Id. Factual impossibility is "irrelevant"; "the 'reasonable capability' analysis 'looks to whether a defendant would have been able to consummate a narcotics transaction if the facts were as he believed them to be.'" Id. (quoting United States v. Howard, 998 F.2d 42, 51 (2d Cir. 1993).

4. Void for Vagueness Doctrine and Johnson

In 2015, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA") violates the Constitution's guarantee of due process because it is unconstitutionally vague. Johnson v. United States, 135 S. Ct. 2551

(2015). The clause at issue defined "violent felony" to include any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." Id. at 2555 (quoting 18 U.S.C. § 924(e)(2)(B)). The Court determined that the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." Id. at 2557. If a statute is held to be void for vagueness, then a criminal defendant may have his or her conviction overturned. See, e.g., id.

B. Discussion

Several of Camacho's alleged grounds for relief rest on the fact that his conviction rests upon a sting operation involving heroin but that, in reality, no heroin ever existed. According to Camacho, this lack of a "real" narcotic necessitates a conclusion that the government manufactured jurisdiction. In addition, he asserts that in all events, 21 U.S.C. §§ 841 and 846 are void for vagueness under Johnson. Camacho's claims are without merit. Read in the light most favorable to petitioner, his claims essentially amount to an impossibility defense: because the heroin never existed, Camacho claims, the government should not be able to prosecute him.

1. Impossibility Defense

When a defendant is accused of a crime, factual impossibility is irrelevant and not a defense. Instead, the Court determines whether the defendant would have been able to commit the crime if the facts were as he believed they were. Hendrickson, 26 F.3d at 337. Here, the facts demonstrated that Camacho was part

7

of a conspiracy. If the facts had been as Camacho expected just before he was arrested, he would have robbed the purported narcotics traffickers. It was the "absence of drugs, not the lack of intent or an agreement among the co-conspirators, [that] precluded the defendant from realizing his plan." Id. at 337. Further, Camacho was convicted of conspiracy to possess with intent to distribute heroin—whether or not the heroin existed in fact is irrelevant. Thus, even if it were an option, he could not support an impossibility defense.

2. Manufactured Jurisdiction

Nor can Camacho support a claim that the Government "manufactured jurisdiction." A sting operation is not impermissible manufacturing, as it does not add an element to the crime to federalize it when that element would not have existed without the Government's intervention. Petitioner points to United States v. Archer, 486 F.2d 670 (2d Cir. 1973), for support, but Archer is inapposite. There, the conviction was overturned because federal agents provoked interstate phone calls to "set up a federal crime, [going] beyond any proper prosecutorial role and needlessly inject[ing] the Federal Government into a matter of state concern." Archer, 486 F.3d at 672. Here, the crime Camacho committed—conspiracy to possess and distribute narcotics—is itself a federal offense. In fact, the Archer Court distinguished cases similar to Camacho's. See Archer, 486 F.3d at 677 (noting that the federal agents' activity was "substantially more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests."). The Government did not manufacture some interstate

8

element to an otherwise wholly local crime in order to create federal jurisdiction—nor did it need to. As such, the Government did not manufacture its jurisdiction.

### 3. Void for Vagueness

Finally, Camacho uses the absence of any drugs in fact to claim that 21 U.S.C. §§ 841 and 846 are void for vagueness under Johnson. However, neither statute denies a defendant fair notice or is subject to arbitrary enforcement. Rather, § 841 is specific, and § 846, which criminalizes conspiracy to violate § 841, benefits from § 841's specificity. Together, the statutes clearly delineate possession of controlled specific amount of specific controlled substances as crimes, and they provide specific sentencing minimums. There can be no valid argument that Camacho had no notice that his actions were unlawful.

\* \* \*

For the foregoing reasons, the fact that Camacho's conduct here was in response to a sting operation is not a valid ground for habeas relief. And in any case, Camacho pled guilty to the count. (Plea Tr. at 36:1–3.) He cannot now claim that he could not have committed the crime in fact.

### III. BREACH OF PLEA AGREEMENT

#### A. Legal Principles

In assessing a claim that the Government breached a plea agreement, courts must review interpretations of plea agreements de novo and in accordance with principles of contract law. United States v. Vaval, 404 F.3d 144, 152 (2d Cir. 2005) (citing United States v. Riera, 298 F.3d 128, 133 (2d Cir. 2002)). Plea agreements

9

are construed strictly against the Government and the court should not "hesitate to scrutinize the Government's conduct to ensure that it comports with the highest standard of fairness." United States v. Lawlor, 168 F.3d 633, 637 (2d Cir.1999). Courts must also look to what the parties reasonably understood to be the terms of the agreement, and because plea bargains require defendants to waive fundamental constitutional rights, prosecutors are held to meticulous standards of performance. Id. at 636. In order to preserve the integrity of plea bargaining procedures and public confidence in the criminal justice system, a defendant is generally entitled to the enforcement of a plea agreement without showing a tangible harm resulting from a breach. Vaval, 404 F.3d at 155.

In Vaval, the court found that the Government breached a plea agreement after it had explicitly promised not to seek an upward departure and to "take no position concerning where within the Guidelines range . . . the sentence should fall," but then at sentencing "volunteered highly negative characterizations of appellant's criminal history as 'appalling' and his purported contrition as 'disingenuous,'" and asked the court "to consider all of that when making the Court's decision about where to sentence this defendant." Id. at 149–50, 153. By contrast, the court in United States v. Amico, 416 F.3d 163 (2d Cir. 2005), found that the Government did not breach a plea agreement by making comments at the defendant's sentencing hearing that were "mild, non-provocative, merely informative, and substantially justified" in nature. Id. at 168.

B. Discussion

10

Camacho's plea agreement stipulated to a sentencing range of 151–188 months. (Mot. at 6.) Camacho claims that the Government breached the plea agreement because at his sentencing proceeding, the Government "never even alluded to the stipulated sentencing range . . . [and] submitted information in an effort to urge the Court to impose a sentence greater than what the government stipulated to." (Id.)

The Government has no obligation to "remind the Court" of the stipulated range, (Mot. at 6.), and it did not, at sentencing, "volunteer[] highly negative characterizations" of the defendant, Vaval, 404 F.3d at 149–50. The Court's upward variance resulted from facts it learned at the trial of Camacho's co-defendant, Louis Borrero. (Dec. 17, 2013 Hearing Tr. at 12:14–13:3.) In fact, at both the December 17, 2013 hearing and the sentencing hearing, the Government was relatively passive, with most of the conversation taking place between the Court and Camacho's counsel. On December 17, 2013 in particular, the Government noted that if a Fatico hearing were held, it would only present "evidence for the purpose of providing information to the Court relating to 3553(a) and not because the government is seeking a departure. We do stand by our plea agreement." (Id. at 13:14–16.)

As a result, the Court holds that the Government did not breach its plea agreement with Camacho.

11

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal Principles

#### 1. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, Camacho "must [first] show that counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688 (1984). In addition, petitioner must demonstrate that counsel's "deficient performance prejudiced the defense," id. at 687, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

As to the first prong of Strickland, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel. Id. at 688-89. As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689).

As to the second prong of Strickland, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the

result would have been different.  Strickland, 466 U.S. at 694.  More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693.

Under Strickland, "strategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. 466 U.S. at 690–91.  "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689).  A "lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting DeLuca v. Lord, 77 F.3d 578, 588 n.3 (2d Cir. 1996)).  "The likelihood that an affirmative defense will be successful at trial and an assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial are clearly relevant to the determination of whether an attorney acted competently in recommending a plea." Panuccio v. Kelly, 927 F.2d 106, 109 (2d Cir. 1991).

2. Entrapment & Coercion

To successfully assert an entrapment defense, a defendant must demonstrate, by a preponderance of the evidence, "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000) (quoting United States v. Salerno, 66 F.3d 544, 547 (2d Cir. 1995)). "A defendant is predisposed to commit a crime if he is 'ready and willing without persuasion' to commit the crime charged and 'awaiting any propitious opportunity' to do so." Salerno, 66 F.3d at 547 (quoting United States v. Harvey, 991 F.2d 981, 992 (2d Cir. 1993)). Predisposition may be shown by evidence of "(1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." Salerno, 66 F.3d at 548 (quoting United States v. Valencia, 645 F.2d 1158, 1167 (2d Cir. 1980)).

To assert a defense of coercion, the defendant must demonstrate that he "engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist." N.Y. Penal Law § 40.00.

14

B. Discussion

Camacho claims that his counsel was ineffective for two reasons: (1) he failed to advise Camacho on affirmative defenses, namely, entrapment and coercion; and (2) he failed to advise Camacho on the impact of his codefendant Borrero going to trial.[2] The Court addresses each in turn.

1. Entrapment & Coercion

Camacho's attorney did not provide ineffective assistance of counsel if he failed to assert or inform Camacho of an entrapment or coercion defense. Whether he informed Camacho of such defense or not is ultimately irrelevant. An entrapment or coercion defense was not supported by the evidence.

Camacho claims that "this case was engineered by the government, through its agents who created a fictitious crime of robbery of a stash house." (Mot. at 10.) He argues that he was not "prowling for a robbery to commit or looking for any drugs to sell." (Id. at 11.) Rather, he was "pulled into a scheme concocted by the government and controlled by the government." (Id.) As such, he claims, there was "no plausible justification for counsel to have not at least made Petitioner aware of the existence of affirmative defenses of entrapment and coercion . . . ." (Id.)

First, assuming arguendo that Camacho's counsel decided not to pursue an entrapment or coercion defense and not to inform Camacho of the same, these decisions were reasonable given the record in this case and the low likelihood of

---

[2] Camacho also claims that, in the event any of his grounds for habeas relief are valid but were not raised at an earlier juncture in the proceeding, his counsel was ineffective for failing to raise and/or preserve issues. (Mot. at 12.) This claim is moot, as the Court holds that Camacho has no grounds for habeas relief.

15

success for asserting such a defense. The record in this case demonstrates that Camacho was willing to serve as the leader of the crew that would rob the purported narcotics traffickers from the very first time he spoke with a confidential government informant, and in several other meetings he expressed a willingness to do so. Indeed, when CI-1 told Valle about the narcotics stash house, Valle was the one to raise Camacho as the right person for the job, demonstrating Camacho's known predisposition for this type of crime. As a result, it was reasonable for Camacho's counsel to conclude that his client had shown "a willingness to commit the crime" as demonstrated by a "ready response to the inducement." Salerno, 66 F.3d at 548.

Relatedly, there is no evidence of Camacho being under threat of physical force—nor does he claim to have been. In fact, at his plea hearing, when the Court asked if he had been coerced by anyone to plead guilty, including anyone "over at the MCC who . . . [Camacho] was afraid of," Camacho said he had not been coerced and agreed with the Court that "[coercion] would be something that just wouldn't happen to him." (Plea Tr. at 21:14–25.) It was thus reasonable for his counsel to conclude that a coercion defense would not succeed.

Decisions by Camacho's counsel not to inform his client of the defenses' availability thus survive Strickland, especially in light of the fact that the entrapment defense is risky and rarely successful. See, e.g., United States v. Balis, Nos. 08-cv-5637, 03-cr-1028, 2009 WL 1117274, at *6 (S.D.N.Y. Apr. 24, 2009) (noting that the entrapment defense is risky because it "in effect admits that the

16

defendant engaged in criminal conduct, and attempts to explain away the commission of criminal acts," and generally "dilute[s] the force of a denial of wrongdoing").[3]

In any event, even assuming Camacho were able to show that his attorney's conduct was somehow deficient, he fails to show that he suffered prejudice as required under Strickland. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). As explained above, in light of the record here, it is unlikely that Camacho would have been entitled to a jury instruction on entrapment or coercion, let alone that he would have succeeded on either defense at trial.

In sum, Camacho's counsel did not provide ineffective assistance of counsel by failing to inform Camacho of an entrapment or coercion defense when recommending that he plead guilty.

### 2. Impact of Borrero's Trial

As noted above, the Court learned facts at Borrero's trial that made it consider, and ultimately implement, an upward variance at sentencing. (Dec. 17, 2013 Hearing Tr. at 6:14–7:6.) Camacho asserts that his counsel was ineffective for failing to inform him that if he pled guilty and a co-defendant went to trial,

---

[3] Moreover, it is worth noting that there is "no hint in the record that [defendant], well represented by a competent attorney, was unaware that entrapment or coercion could be used as a defense." United States v. Michaelson, 552 F.2d 472, 475–76 (2d Cir. 1977).

17

Camacho could still be "subjected to the same sentence he could get if he went to trial." (Mot. at 12.) However, counsel's actions with regards to Borrero's trial are irrelevant—at Camacho's plea hearing, Camacho told the Court that he understood that the Court is "required to do its own calculation of [his] offense level," which might be higher than that calculated by the government. (Plea Tr. at 23:1–6.) The Court asked specifically whether he understood that the Court could receive a sentence higher than that which petitioner "had bargained for," and Camacho answered in the affirmative. (Plea Tr. at 23:7–11.) As such, Camacho cannot assert ineffective assistance with regards to the Court's upward variance, as he was fully aware of that possibility before entering his guilty plea.

V. CONCLUSION

For the reasons set forth above, petitioner's § 2255 motion to vacate, set aside or correct his sentence is DENIED. The Court declines to issue a certificate of appealability, as Camacho has not made a substantial showing of a denial of a federal right. See Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012). The Clerk of Court is directed to terminate Camacho's petition at 17-cv-1440 ECF No. 1 and 13-cr-58 ECF No. 610 and to terminate 17-cv-1440.

SO ORDERED.

Dated:   New York, New York
         January 10, 2018

_____
KATHERINE B. FORREST
United States District Judge

Copy to:
Javion Camacho
67878-054
FCI Bennetsville
P.O. Box 52020
Bennetsville, SC 29512